**HOUSING AND REDEVELOPMENT AUTHORITY OF the CITY OF ST. PAUL, Respondent,**

v.

**Ferris ALEXANDER, et al., Appellants.**

**No. C0–88–1683.**

Court of Appeals of Minnesota.

March 21, 1989.

Review Denied May 24, 1989.

Edward P. Starr, St. Paul City Atty., Philip B. Byrne, Asst. City Atty., St. Paul, for respondent.

Gary Y. Pang, Minneapolis, for appellants.

Heard, considered and decided by FORSBERG, P.J., and PARKER and SHORT, JJ.

## OPINION

PARKER, Judge.

Ferris and Dolores Alexander appeal the trial court's decision to grant the request of the Housing and Redevelopment Authority of the City of St. Paul (HRA) for specific performance. The trial court ordered the Alexanders to comply with its previous declaratory judgment interpreting an option provision in a purchase agreement involving commercial real property in St. Paul. We affirm.

## FACTS

On October 3, 1983, the Alexanders sold property located in St. Paul to John Rupp, an attorney and real estate developer. The transaction involved the sale of five parcels of land as well as an option to purchase a sixth parcel located at Dale and University. An adult entertainment center is situated on the sixth parcel. The option provided alternative purchase prices contingent upon certain zoning actions taken by the St. Paul City Council. The option language, contained in paragraph 23(b) of the purchase agreement, provided:

> The purchase price for the Optioned Property shall be Three Hundred Thousand and No/100 Dollars ($300,000), cash, due and payable at the closing (the "Option Closing"), PROVIDED, HOWEVER, that in the event the City of St. Paul adopts *an ordinance which regulates adult entertainment and prohibits such activity outside an area having a new zoning classification enacted specifically for such purposes,* and which ordinance grants or has granted a nonconforming use or "grandfather" status to the current use of the Optioned Property at the time of the exercise of the Option, the purchase price for the Optioned Property shall be Seven Hundred Fifty Thousand and No/100 Dollars ($750,000) cash, due and payable at the Option Closing.

(Emphasis added).

The contract and the option provision evolved from negotiations between Randall Tigue, who was the Alexanders' attorney, and Rupp. Even though Rupp was the purchaser, the record indicates that the Alexanders paid Rupp $100,000 for his services in connection with the purchase agreement. The option provision arose out of the Alexanders' concern that a zoning ordinance under consideration would limit the ability to open future adult entertainment centers in St. Paul, thereby making the one on the sixth parcel more valuable. Thus, Tigue's role was to protect the Alexanders' ability to obtain a substantially greater price for that parcel in the event the proposed zoning ordinance passed.

It appears that throughout the negotiations Rupp intended ultimately to assign his interest in the real property, including the option provision, to the HRA. The record indicates that Tigue knew of Rupp's intention and that Rupp was negotiating with the HRA while he negotiated with the Alexanders. In fact, all of the proposals for option language put forth by Tigue were reviewed by the HRA and the St. Paul City Attorney's office. Testimony indicates that the goal of any city input in

the negotiations was to protect the city from having to pay the higher price in the event it chose to exercise the option. The Alexanders and the HRA did not communicate directly until closing on the purchase agreement.

On October 4, 1983, the day after he had executed the purchase agreement with the Alexanders, Rupp assigned the contract to the HRA. On October 6, 1983, the St. Paul City Council enacted an adult entertainment zoning ordinance restricting the location of adult entertainment within the city of St. Paul. All of the parties, including Tigue, appear to have been aware of the proposed language of the ordinance which was ultimately enacted. The passage of the ordinance triggered the parties' dispute on whether it would require the HRA to pay the $750,000 when it exercised its purchase option under the terms of the agreement.

The Alexanders contended that passage of the ordinance required the HRA to pay the higher price. The HRA, however, advocated a more precise reading of the option language based on the two types of commonly used zoning restrictions. One type is the "war zone" ordinance, under which all adult entertainment is limited to one concentrated area. The other requires these establishments to be dispersed throughout the city. The St. Paul ordinance is the latter type. The HRA moved for a declaratory judgment, asking the trial court to settle the dispute and determine how much it would have to pay for the property pursuant to the purchase agreement.

On October 15, 1987, the trial court issued its declaratory judgment. Based on the "clear and unambiguous" language of the contract, the trial court found that the ordinance did not trigger the higher price. The court refused to consider the parties' subjective intentions in entering into the agreement. While the ordinance regulated adult entertainment and granted grandfather status to non-conforming uses, the trial court concluded that because the ordinance did not require all adult entertainment to be located in one concentrated area, it was not the type of "war zone" ordinance contemplated by the clear language in the agreement triggering the option provision. As a result, the declaratory judgment provided that the HRA could purchase the property at Dale and University for $300,000 rather than $750,000. The Alexanders did not appeal this interpretation of the option provision.

Following entry of the declaratory judgment, the Alexanders refused to comply with its terms and sell the property to the HRA for $300,000. The HRA then brought suit for specific performance of the terms of the declaratory judgment. On June 30, 1988, the trial court found that the HRA had exercised the option by written notice dated December 11, 1987, that the Alexanders had failed and refused to comply with the terms of the purchase agreement and the option, and that the HRA had not committed any fraud in connection with the purchase agreement. The trial court concluded that the HRA was entitled to specific performance.

It affirmed its prior interpretation of the contract and option and found there was inadequate evidence to support a finding of fraud. When the Alexanders claimed mutual mistake by raising the issue of a failure of the "meeting of the minds," the trial court concluded that the declaratory judgment had dealt with that defense and it was now barred by collateral estoppel. As an alternative to collateral estoppel, the trial court also concluded that no new evidence was introduced which would have caused it to rule any differently than it had in the declaratory judgment.

## ISSUES

1. Did the trial court err in finding that appellants' claim of mutual mistake was barred by collateral estoppel?

2. Did the trial court err in finding no evidence of fraudulent inducement in the execution of the option provision?

## DISCUSSION

### I

■ The trial court, in applying the doctrine of collateral estoppel, stated that the

claim of mutual mistake had been resolved when it found no merit to the Alexanders' claim that no "meeting of the minds" ever existed on the terms of the option provision. The trial court concluded that the parties were before the court in the declaratory judgment action, the purchase agreement was valid, the purchase price for the sixth parcel was $300,000, the judgment was final because no appeal had been filed, and specific performance was an appropriate remedy. We agree with the trial court's application of collateral estoppel.

■ As a preliminary matter, the Alexanders claim that the HRA failed to plead collateral estoppel as an affirmative defense and thus waived the right to assert it. We find no merit to this argument. While the HRA did not use the explicit phrase "collateral estoppel" in response to the Alexanders' defenses, it did affirmatively plead res judicata. The Minnesota Supreme Court has stated that collateral estoppel is a distinct and important aspect of the effect of res judicata. *Hauser v. Mealey,* 263 N.W.2d 803, 806 (Minn.1978). Likewise, the Restatement of Judgments discusses issue preclusion within the context of the rules of res judicata. When an issue of fact or law is actually litigated and determined by a valid final judgment and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties. *Restatement (Second) of Judgments* § 27 (1980). Issue preclusion is sometimes designated as direct estoppel when it involves a second action on the same claim. *Id.* at comment b. The HRA's pleading of the general principle of res judicata was sufficient.

The application of collateral estoppel is appropriate when (1) the issue was identical to the one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue. *Ellis v. Minneapolis Commission on Civil Rights,* 319 N.W.2d 702, 704 (Minn.1982).

The trial court received evidence and made findings and conclusions on the "meeting of the minds" issue in the declaratory judgment action. It concluded that the language of the agreement was clear and unambiguous and that the objective language, rather than the parties' subjective intent, would control. Thus, mutual mistake and the related "meeting of the minds" issue were clearly raised in the declaratory judgment action.

The supreme court has stated that the res judicata effect of a declaratory judgment is no different from the res judicata effect of any other judgment. *Howe v. Nelson,* 271 Minn. 296, 301, 135 N.W.2d 687, 691 (1965). Because the Alexanders did not appeal the declaratory judgment, it was a final judgment on the merits. It cannot be disputed that both parties were involved in the declaratory judgment motion and the specific performance motion. The record also indicates that the Alexanders had more than ample opportunity to be heard on the "meeting of the minds" issue. The trial court did not err in its application of collateral estoppel.

II

The trial court made findings in support of its declaratory judgment, stating that the purchase agreement was valid and enforceable and that the clear and unambiguous wording must control. The Alexanders did not raise any fraud allegations in their answer to the HRA's complaint requesting a declaratory judgment, nor did the trial court find the existence of any fraudulent conduct on HRA's part.

■ When a party is attempting to avoid a written instrument on the ground that one of the contracting parties was induced to execute it upon the false representation that it expressed the parties' agreement, the evidence of fraud must be clear and convincing. *Hentges v. Schuttler,* 247 Minn. 380, 383, 77 N.W.2d 743, 746 (1956). This court will not interfere with a trial court's decision to grant specific performance unless the trial court clearly abused its discretion. *Flynn v. Sawyer,* 272 N.W. 2d 904, 910 (Minn.1978).

In Minnesota, to prove a prima facie case of fraud a party must show that (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) it was made with knowledge of the falsity of the representation, or made without knowing whether it was true or false but with intention to induce another to act in reliance thereon; and (3) the representation caused the other party to act in reliance thereon to his pecuniary damage. *Burns v. Valene*, 298 Minn. 257, 261, 214 N.W.2d 686, 689 (1974).

█ The record supports the trial court's conclusion that the Alexanders did not prove a prima facie case of fraud in the inducement by clear and convincing evidence. The Alexanders' fraud claims focus on Rupp's role as middleman in the negotiations. Based on the trial court record, we believe that the Alexanders' lawyer, Randall Tigue, knew of Rupp's involvement with the HRA during contract negotiations and that Rupp was anticipating assigning his interest in the contract to the city. Furthermore, there is no merit to the Alexanders' claim that Rupp worked as an agent for the city, because the Alexanders paid him $100,000 for his services in the negotiation. This fraud claim should have been raised at the declaratory judgment action, as it goes to the merits of the proceeding.

## DECISION

Affirmed.